UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| SOUTH BEACH SECURITIES, INC., | ) | Case No. 05 B 16679 |
| | ) | |
| Debtor. | ) | Judge A. Benjamin Goldgar |
| | ) | |
| | ) | Hearing Date: July 18, 2005 |
| | ) | Time: 10:00 a.m. |

**WACHOVIA SECURITIES, LLC'S BRIEF IN OPPOSITION TO
AMENDED APPLICATION OF DEBTOR FOR AN ORDER
AUTHORIZING EMPLOYMENT AND RETENTION OF ATTORNEYS**

Wachovia Securities, LLC, ("Wachovia"), by and through its attorneys, Bryan I. Schwartz, Gary I. Blackman and Christopher S. Griesmeyer of Levenfeld Pearlstein, LLC, respectfully submits this Brief in opposition to the *Amended Application of the Debtor for an Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a), Authorizing the Employment and Retention of Attorneys* (the "Motion"), and states as follows:

## I. ARGUMENT

The grounds – including the legal arguments and underlying facts – for Wachovia's objections to the Motion filed by South Beach Securities, Inc. in this matter are the same grounds articulated in Wachovia's objection to the *Amended Application of the Debtor for an Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a), Authorizing the Employment and Retention of Attorneys* filed in the related *In re NOLA, LLC* bankruptcy proceeding, 05 B 16682. Accordingly, rather than re-drafting Wachovia's brief in the *NOLA* bankruptcy proceeding and forcing this Court and opposing counsel to re-visit the same facts, law and arguments, Wachovia respectfully adopts and incorporates that brief, along with its exhibits, by reference. To maintain an accurate record, a copy of Wachovia's brief in the *NOLA* proceeding is attached as Exhibit 1.

LP 774112.2 \ 34048-50381

## II. CONCLUSION

WHEREFORE, for all of the reasons set forth in Wachovia Securities, LLC's brief attached hereto as Exhibit 1, Wachovia Securities, LLC, respectfully requests that this Court enter an Order denying the *Amended Application of the Debtor for an Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a), Authorizing the Employment and Retention of Attorneys*, and granting any such other and further relief as it deems just.

Respectfully submitted,

**WACHOVIA SECURITIES, LLC**

By: /s/ Christopher S. Griesmeyer
One of Its Attorneys

BRYAN I. SCHWARTZ (ARDC 6192739)
GARY I. BLACKMAN (ARDC 6187914)
CHRISTOPHER S. GRIESMEYER (ARDC 6269851)
LEVENFELD PEARLSTEIN, LLC
2 North LaSalle Street
Suite 1300
Chicago, Illinois 60602
(312) 346-8380
(312) 346-8434 (Fax)

# Exhibit 1

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| NOLA, LLC, | ) | Case No. 05 B 16682 |
| | ) | |
| Debtor. | ) | Judge A. Benjamin Goldgar |
| | ) | |
| | ) | Hearing Date: July 18, 2005 |
| | ) | Time: 10:00 a.m. |

**WACHOVIA SECURITIES, LLC'S BRIEF IN OPPOSITION TO
AMENDED APPLICATION OF DEBTOR FOR AN ORDER
AUTHORIZING EMPLOYMENT AND RETENTION OF ATTORNEYS**

Wachovia Securities, LLC, ("Wachovia"), by and through its attorneys, Bryan I. Schwartz, Gary I. Blackman and Christopher S. Griesmeyer of Levenfeld Pearlstein, LLC, respectfully submits this Brief in opposition to the *Amended Application of the Debtor for an Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a), Authorizing the Employment and Retention of Attorneys* (the "Motion"), and states as follows:

## I. PRELIMINARY STATEMENT

This case is not about NOLA, LLC ("NOLA") or South Beach Securities, Inc. ("South Beach"). Nor is this case a legitimate bankruptcy filing by a legitimate corporate entity. Rather, this case is about how Leon A. Greenblatt, III ("Greenblatt") and his co-conspirators (Andrew Jahelka, Richard Nichols, David Neuhauser and Leslie Jabine) used NOLA, South Beach and dozens of other shell companies to defraud investors, creditors, the SEC and the public at large out of tens of millions of dollars. Greenblatt's fraudulent scheme involved using numerous alter ego shell corporations to open accounts with almost a dozen brokerage firms for the illegal purpose of surreptitiously acquiring a controlling interest in the publicly traded securities of Health Risk Management, Inc. ("HRMI").

Greenblatt's decision to employ multiple shell corporations not only facilitated his scheme to surreptitiously acquire a controlling interest in HRMI, but it also provided him with the perfect opportunity to defraud his creditors by hiding and transferring assets. As explained below, Greenblatt has

LP 773477.2 \ 34048-50381

engaged in an impossibly complex shell game involving dozens of corporations, including the following entities, each of which Gould & Ratner has represented in the past, is currently representing, or is seeking to represent via the instant Motion:

- NOLA;
- Teletech Systems, Inc. (a manager of NOLA);
- South Beach (a creditor and wholly-owned subsidiary of NOLA);
- Scattered Corp. (a creditor of South Beach);
- Loop Corp. (a creditor of both NOLA and South Beach); and
- Loop Properties, Inc. (a subsidiary of Loop Corp.).

Each of these corporate entities is directly owned or controlled by Greenblatt, and "maintains" an address at one of his buildings – 330 South Wells Street in Chicago, Illinois. In truth, these corporations have no assets, employees or operations, but exist only on paper. For this reason, allowing Gould & Ratner to represent NOLA and South Beach in this case – despite the obvious conflict presented by the fact that South Beach is a ***creditor*** of NOLA, and Scattered Corp. is a ***creditor*** of South Beach – would merely facilitate Greenblatt's fraudulent scheme.

Ultimately, this Court will be called upon not to review the assets and liabilities of NOLA and South Beach and determine the fairest and best possible plan for reorganization or liquidation. Rather, the Court's ultimate charge will be to unravel Greenblatt's web of fraud and hold him and his colleagues personally liable for the debts of their numerous shell companies. Allowing one firm to represent all of these shells based upon their hollow assurances that there will be no conflicts (or if so, that the conflicts have been "waived") will only facilitate Greenblatt's fraudulent scheme and render this Court's job infinitely more difficult. For all of these reasons, the pending Motion to employ Gould & Ratner should be denied.

## II. FACTUAL BACKGROUND

Greenblatt's shell game is extremely complex. Unfortunately, in order to fully understand the nature of the conflicts presented by Gould & Ratner's Motion, a fairly detailed recitation of the factual background behind Greenblatt's fraudulent scheme is required. The following documents will also assist

2

the Court in understanding the many inter-relationships between Greenblatt's myriad of shell corporations, his HRMI takeover scheme, and his fraudulent transfers between the various shells:

| | |
|---|---|
| Exhibit A: | Spreadsheet detailing relevant organization of Greenblatt's empire; |
| Exhibit B: | Spreadsheet detailing Greenblatt's use of shell companies to acquire HRMI stock; and |
| Exhibit C: | Spreadsheet detailing Greenblatt's use of shell companies to hide assets and defraud creditors. |

### A. AN OVERVIEW OF GREENBLATT'S SHELL GAME

Mr. Greenblatt is a high-risk investor, specializing in bankruptcy arbitrage. He funnels his investment activities through dozens of corporate shells. (*See,* Ex. A). Many of these entities serve no purpose other than to provide multiple layers of limited liability protection for Greenblatt and his colleagues. For example, according to the Debtors' schedules in this case, NOLA's only "asset" is the stock of South Beach; South Beach's only asset, in turn, is shares of HRMI. Moreover, NOLA's manager is Teletech Systems, Inc., which is owned or controlled by Greenblatt.

Each of the entities identified on the spreadsheet attached as Exhibit A is ultimately owned or controlled by Mr. Greenblatt, his wife, Leslie Jabine, or one of their colleagues, Andrew Jahelka, Richard Nichols or David Neuhauser. Moreover, each of these entities is a mere shell, existing only on paper, operating out of one of Greenblatt's buildings – 330 South Wells Street in Chicago, Illinois. As explained below, Greenblatt and his colleagues used a number of these shell entities to surreptitiously acquire a controlling interest in HRMI. When his scheme fell apart, Greenblatt used these shells to transfer assets from one entity to the other as his creditors began closing in. Gould & Ratner has represented – and currently still represents – a number of these shell entities, and therefore cannot represent NOLA or South Beach in this case as well.

### B. GREENBLATT'S EFFORTS TO ACQUIRE HRMI

On August 28, 1998, Greenblatt wrote to Dr. Gary T. McIlroy, the CEO of HRMI, and offered to acquire the company. (A true and correct copy of Greenblatt's letter is attached as Exhibit D). Dr. McIlroy rejected this offer. Greenblatt responded by embarking upon a campaign to secretly take over

3

the company by acquiring a majority interest in its publicly-traded securities. As Greenblatt used his corporate shells to acquire more and more HRMI stock, he realized that he would need to address the company's "poison pill," which was designed to prevent the very hostile takeover that Greenblatt was attempting. Accordingly, in February of 1999, Greenblatt, his wife Leslie Jabine, and two of his shell corporations (Chiplease, Inc. and Banco Panamericano, Inc.) petitioned the company for a special shareholders' meeting to repeal the poison pill. HRMI refused this request, and Greenblatt sued. On November 17, 1999, Banco Panamericano prepared proxy materials and asked that the company include a proposal to eliminate the poison pill at HRMI's annual meeting (which would then allow individual shareholders to acquire large blocks of HRMI stock). The company also refused this request, and Greenblatt sued again.

### C. THE HRMI STANDSTILL AGREEMENT

These lawsuits eventually culminated in the May 19, 2000 Standstill Agreement between Greenblatt, Jabine, Banco Panamericano and Chiplease on the one hand, and HRMI on the other hand. (A true and correct copy of this Standstill Agreement is attached as Exhibit E). Under the Standstill Agreement, Greenblatt – including his associates and shell corporations – was precluded from acquiring more than 40% of the publicly-traded shares of HRMI stock. The Standstill Agreement also provided Greenblatt's associate, Andrew Jahelka, with a seat on HRMI's board of directors. (Jahelka would eventually use his position as an HRMI board member to appoint Greenblatt as the company's chief restructuring officer). The company announced the terms of the Settlement Agreement, fueling public interest in the stock.

### D. GREENBLATT'S NOLA ACCOUNT

In February of 2001, Greenblatt's associate, David Neuhauser, opened a margin account at Wachovia (then Prudential Securities Incorporated) in the name of NOLA, LLC. (True and correct copies of the NOLA account documents are attached as Group Exhibit F). In opening the account, Neuhauser expressly represented to Wachovia that he, as well as NOLA and its principals, would conduct trading in accordance with all applicable laws and regulations.

4

Contrary to these representations, Greenblatt used his NOLA account as yet another vehicle to surreptitiously acquire a controlling interest in HRMI stock. His initial investment in the NOLA account was a fairly modest 10,000 shares of HRMI. During the month of April 2001, however, Greenblatt used his NOLA account to acquire another 143,500 shares of HRMI stock, for a total purchase price of $1,150,000 – but entailing net cash deposits of less than $200,000, as he used the increased value of the already-purchased HRMI shares to fund the margin debt on these new purchases. This enabled Greenblatt to shift the risk of his investment scheme to Wachovia, the margin creditor on the NOLA account.[1]

### E. GREENBLATT'S SCHEME TO DEFRAUD

Greenblatt used his NOLA account – along with almost two dozen other accounts – to shield his acquisitions of HRMI stock from the public, the SEC and HRMI itself. Greenblatt's scheme involved two core components: (1) acquiring large blocks of HRMI stock, often on margin; and (2) acquiring that stock through multiple accounts in the names of numerous shell corporations, thereby allowing Greenblatt to conceal his activities from the SEC and HRMI. The brokerage accounts opened in the names of NOLA, South Beach and Teletech Systems, Inc. were just small components of Greenblatt's much larger fraudulent scheme.

On April 5, 2001, Greenblatt disclosed on a Schedule 13D filing with the SEC that he and his wife controlled almost 30% of the outstanding shares of HRMI, either through their direct ownership or through their control over certain shell corporations – Chiplease, Banco Panamericano and Loop Corp. (A true and correct copy of the April 5, 2001 filing is attached as <u>Exhibit G</u>). The Greenblatts updated their Schedule 13D filing on April 12, 2001, and disclosed that they had increased their holdings to almost 39% of the outstanding shares of HRMI. (A true and correct copy of the April 12, 2001 filing is

---

[1] This can be a highly profitable – albeit risky – strategy. If the stock continues to rise, the investors can sell some HRMI shares for a profit while retaining the remainder without any actual cash outlay. On the other hand, if the stock drops, the investors only have a small percentage of the investment at risk. The overwhelming portion of the investment risk remains with Wachovia, the investors' margin creditor. Thus, the more HRMI stock Greenblatt acquired, the higher the price of that stock rose, thereby allowing him to purchase more and more shares of HRMI on margin. Greenblatt's investment strategy ultimately failed when NASDAQ halted trading in HRMI.

attached as Exhibit H). ***Notably, NOLA is nowhere mentioned in these disclosures.*** The reason for this is clear: in the May 19, 2000 Standstill Agreement, Greenblatt represented that he had no plans or intention of acquiring additional HRMI shares in excess of the 40% of the outstanding shares of the Company. (*See*, Ex. E).

The shares of HRMI that Greenblatt acquired through his NOLA account thus breached the Standstill Agreement and violated the SEC rules pertaining to Schedule 13D disclosures. In addition to hiding his NOLA holdings from the SEC, Greenblatt also failed to disclose on his Schedule 13D filings the holdings of Repurchase Corp., South Beach Securities, Inc. and Teletech Systems, Inc. Far from the 1.8 million shares disclosed on the Schedule 13D report, Greenblatt had actually acquired *more than 3.5 million shares of HRMI stock* during the 18-month time period from January 2000 and May 2001. Greenblatt acquired this stock – and hoped to avoid SEC regulations and reporting requirements – by using *nineteen* different trading accounts at *eleven* different brokerage firms, under the names of *eight* different shell entities:

| SHELL ENTITY | BROKERAGE FIRM | STOCK | SHARES ACQUIRED | ACQUISITION DATES |
|---|---|---|---|---|
| Banco Panamericano, Inc. | Bear Stearns | HRMI | 243,225 | Jan. – Jun. 2000 |
| Banco Panamericano, Inc. | First Union Securities | HRMI | 124,000 | April 2001 |
| Banco Panamericano, Inc. | Miller, Johnson, Steichen & Kinnard ("MJSK") | HRMI | 413,100 | Sept. 2000 – May 2001 |
| Banco Panamericano, Inc. | Northern Trust Securities | HRMI | 220,150 | Jan. 2000 – May 2001 |
| Banco Panamericano, Inc. | PaineWebber | HRMI | 56,000 | Feb. 2000 |
| Banco Panamericano, Inc. | South Beach Securities | HRMI | 10,300 | May 2000 |
| Banco Panamericano, Inc. | Stifel, Nicolaus & Co. | HRMI | 15,680 | Before May 2001 |
| Chiplease, Inc. | First Union Securities | HRMI | 25,700 | Feb. – April 2001 |
| Chiplease, Inc. | Quick & Reilly | HRMI | 36,500 | Before Aug. 2000 |
| Loop Corp. | MJSK | HRMI | 297,500 | Dec. 2000 – May 2001 |
| Loop Corp. | Prudential (Wachovia) | HRMI | 422,900 | Oct. 2000 – May 2001 |
| NOLA, LLC | MJSK | HRMI | 263,800 | April – May 2001 |
| NOLA, LLC | Prudential (Wachovia) | HRMI | 197,600 | March-May 2001 |
| Repurchase Corp. | Credit Suisse | HRMI | 447,000 | May 2001 |
| Repurchase Corp. | First Union Securities | HRMI | 174,200 | April 2001 |
| Repurchase Corp. | MJSK | HRMI | 320,200 | April – May 2001 |

6

| SHELL ENTITY | BROKERAGE FIRM | STOCK | SHARES ACQUIRED | ACQUISITION DATES |
|---|---|---|---|---|
| Scattered Corp. | H&R Block | HRMI | 27,200 | Before April 2001 |
| South Beach Securities, Inc. | First Union Securities | HRMI | 169,400 | Before May 2001 |
| Teletech Systems, Inc. | Northern Trust Securities | HRMI | 68,050 | Before Feb. 2000 |

These transactions are visually depicted in Exhibit B. By concealing the true purpose of his NOLA account, while simultaneously promising that his trading activity would comply with all applicable laws and regulations, Greenblatt duped Wachovia into acting as the unwitting bankroll for his fraudulent scheme. All of Greenblatt's activities were done with an eye toward defrauding the SEC, HRMI, Wachovia and the public at large.

### F. NASDAQ HALTS TRADING OF HRMI

Greenblatt's scheme began to unravel on May 22, 2001, when the NASDAQ halted trading of the common stock of HRMI on the news that the company's independent auditors had resigned. At this time, the stock declined from a prior day's close of $7.5 per share to $4.75 per share. With the drop in HRMI stock, Greenblatt's NOLA account (as well as his 18 other shell accounts) went from profitable to heavy losses. Greenblatt no longer had the funds – in either cash or marginable securities – to satisfy either the maintenance margin requirements imposed by Wachovia on prior holdings, or the Regulation T margin call issued on more recent purchases. Accordingly, Wachovia issued demands to NOLA to deposit sufficient funds to meet margin. These demands went unheeded. Wachovia next issued demands to Greenblatt and his colleagues as principals of NOLA. These demands also went unheeded.

Consequently, Wachovia began to explore potential legal remedies. In the course of its investigations, it learned of the undisclosed relationships among the various Defendants and the purpose behind the formation of NOLA, LLC. Unfortunately, this knowledge came too late. As of June 19, 2001, Wachovia had extended margin credit to Greenblatt of almost $3 million, consisting of $1,098,459.90 to NOLA, LLC and $1,885,751.44 to Loop Corp. At that time and today, that indebtedness was almost completely unsecured by the accounts' assets. With interest, these unpaid margin debts total more than $3.7 million as of May 2005.

7

Wachovia filed a NYSE arbitration action against Loop and NOLA; these claims were arbitrated on April 28, 2005 – the day after NOLA had filed for bankruptcy protection. Of course, NOLA's counsel did not notify Wachovia of the bankruptcy filing, and instead actively participated in the arbitration hearing. ***On May 10, 2005, Wachovia obtained an arbitration award against Loop Corp. in the amount of $2,349,000, together with $90,000 in attorneys' fees.*** (A true and correct copy of the NYSE's May 10, 2005 award is attached as Exhibit I).[2]

### G. OTHER (RELATED) LAWSUITS

Importantly, this is not the only action involving Greenblatt's use of assetless shell corporations and unwitting broker-dealers to fraudulently acquire a controlling interest in HRMI. Each of the following lawsuits involve Greenblatt's use of alter ego shell corporations – such as NOLA, South Beach, Scattered Corp., Loop Corp., Banco Panamericano, Inc., and Repurchase Corp. – to acquire large blocks of HRMI shares through unwitting broker-dealers:

- *James P. Stepehnson, Trustee for MJK Clearing, Inc., v. Leon A. Greenblatt, Banco Panamericano, Inc., Loop Corp., NOLA, LLC and Repurchase Corp.*, (BKY. No. 03-4053, U.S. Bankruptcy Ct., Dist. of MN);

- *John E. Feltl v. Leon A. Greenblatt, Banco Panamericano, Inc., Loop Corp., NOLA, LLC and Repurchase Corp.*, (Case No. 03-13751, MN State Court, Hennepin County);

- *Wachovia Securities, LLC v. David Neuhauser, Andrew A. Jahelka, Richard O. Nichols, Leon A. Greenblatt, III, Banco Panamericano, Inc., Loop Corp., Loop Properties, Inc. and Scattered Corp.*, (Case No. 04 C 3082, N.D. Ill. (J. Hart));

- *Wachovia Securities, LLC v. Loop Corp., and NOLA, LLC,* (NYSE Arbitration No. 2003-011927);

- *Credit Suisse First Boston, LLC, v. Repurchase Corp., Leon A. Greenblatt, III, Andrew A. Jahelka and Richard O. Nichols*, (NYSE Arbitration No. 2003-014931); and

- *Credit Suisse First Boston, LLC, v. Leon A. Greenblatt, III, Richard O. Nichols and Andrew A. Jahelka*, (Case No. 04 C 2142, N.D. Ill. (J. Grady)).

Nor is this the first time a creditor has found itself chasing one of Mr. Greenblatt's assetless shell corporations. To the contrary, this is part of Greenblatt's business strategy. For example, creditors in (at

---

[2] Because NOLA had notified the NYSE of its bankruptcy filing before the Panel rendered its award (but ***after*** the hearing), the May 10, 2005 award "notes that a determination against Respondent Nola LLC has not been made as Respondent Nola LLC filed a petition of bankruptcy on April 27, 2005." (Ex. I, p. 2).

8

least) the following cases have asserted alter ego and/or veil piercing claims against Mr. Greenblatt and his colleagues:

- *Golf Venture, LLC v. Andrew H. Jahelka, Leon A. Greenblatt and Richard O. Nichols*, (Case No. 03 L 9503, IL Circuit Court of Cook County);
- *Golf Venture, LLC v. Loop Corp.*, (Case No. 02 L 3667, IL Circuit Court of Cook County);
- *City of Chicago v. Loop Corp.*, (Case No. 05 L 50191, IL Circuit Court of Cook County);
- *Credit Suisse First Boston, LLC, v. Leon A. Greenblatt, III, Richard O. Nichols and Andrew A. Jahelka*, (Case No. 04 C 2142, N.D. Ill. (J. Grady)); and
- *Wachovia Securities, LLC v. David Neuhauser, Andrew A. Jahelka, Richard O. Nichols, Leon A. Greenblatt, III, Banco Panamericano, Inc., Loop Corp., Loop Properties, Inc. and Scattered Corp.*, (Case No. 04 C 3082, N.D. Ill. (J. Hart)).

### H. GREENBLATT TRANSFERS AND HIDES ASSETS

Greenblatt, of course, knew that his investment scheme was risky. He therefore ensured that the corporate shells he used to accomplish his scheme were truly empty by the time his margin creditors came calling. He achieved this through a number of inter-related corporate transfers, which are visually depicted on Exhibit C.

For example, after the $1.8 million margin debt became due on the Loop account, Greenblatt looted the Loop corporate shell by making the following payments to Credit Suisse First Boston, for the benefit of Repurchase Corp. (an "affiliate" of Loop, with common ownership and control) ***out of Loop Corp. funds:***

| DATE OF PAYMENT | AMOUNT OF PAYMENT | METHOD OF PAYMENT |
|---|---|---|
| September 27, 2001 | $10,000.00 | Check |
| November 28, 2001 | $10,000.00 | Wire Transfer |
| December 28, 2001 | $10,000.00 | Wire Transfer |
| February 26, 2002 | $10,000.00 | Wire Transfer |
| August 23, 2002 | $3,000.00 | Wire Transfer |

(*See,* Exhibit J, Exhibit C).

These transfers are significant because Repurchase Corp. was another one of Greenblatt's sham corporations that he used to surreptitiously acquire a controlling interest in HRMI. Moreover, these transfers in no way benefited Loop, and Loop did not receive any value whatsoever – let alone "reasonably equivalent" value – from Repurchase for these payments. Tellingly, Repurchase has since

9

filed for bankruptcy protection, thereby preventing Wachovia from asserting any claims against it and mooting any suggestion that Loop's transfers to Repurchase would ever be repaid.

Thus, Greenblatt has engaged in a pattern and practice of applying one affiliate's assets to satisfy the obligations of another affiliate. For example, Loop (Gould & Ratner's client) obtained a $3.25 million loan from Marine Bank on January 26, 2001.[3] (*See*, Exhibit K, Exhibit C). Loop was obligated to make monthly payments of approximately $35,000 to Marine Bank pursuant to a promissory note. (*Id.*). In April of 2004, Loop tendered more than $105,000 in loan payments to Marine Bank ***in the form of checks written on a Chiplease account.*** (*Id.*). For his part, Greenblatt treated this as a "gift" from Chiplease, and the $105,000 was not supported by any consideration from Loop. Furthermore, Loop pledged certain of its assets – namely, its interests in 200 West Partners, LP, 200 West Properties, Inc., Old Colony Partners, LP and Old Colony Properties, Inc. – to Marine Bank as security for the January 26, 2001 loan. (*Id.*). Specifically, Loop transferred $2,198,326 of the Marine Bank loan proceeds to South Beach, a subsidiary of NOLA and an affiliate of Loop. (A true and correct copy of Loop's January 31, 2001 wire transfer request is attached as Exhibit L).[4]

Yet another example of an "affiliate-to-affiliate" fraudulent transfer by Greenblatt involves EZLinks Golf, Inc., identified as a subsidiary of Loop Corp. in Loop's Marine Bank loan application materials. On March 15, 2005, Greenblatt's associate, Richard Nichols (a principal of NOLA) testified that the shares of EZLinks had been transferred to Scattered Corp., another Greenblatt-controlled entity and an affiliate of Loop (not to mention a creditor of South Beach). (A true and correct copy of relevant portions of Mr. Nichols' deposition testimony are attached as Exhibit M).

Still another example of an "affiliate-to-affiliate" fraudulent transfer orchestrated by the Individual Defendants is the April 1, 2002 transaction in which Loop granted Banco Panamericano, Inc. a security interest in all of its "deposit accounts maintained with any organization," as well as a security

---

[3] Wachovia does not know why Loop did not use the $3.25 million in Marine Bank loan proceeds to pay down its margin debt to Wachovia. Instead, it appears that Loop transferred most of those loan proceeds to yet another affiliate – South Beach Securities, Inc., a subsidiary of NOLA, LLC and potential Gould & Ratner client.

[4] ***Curiously, South Beach makes no mention of this $2,198,326 in its bankruptcy schedules.***

10

interest in all of Loop's "property, equipment, trademarks, licenses and any other asset." (*See*, <u>Exhibit N</u>). These assets specifically included all of Loop's interests in its operating subsidiaries: Telegraph Properties, Inc., Randolph Properties, Inc., 200 West Properties, Inc., Old Colony Properties, Inc., EZLinks Golf, LLC, EZLinks Golf, Inc., Telegraph Properties, LP, Randolph Properties, LP, 200 West Partners, LP, Old Colony Partners, LP, and H&M Partners, GP. (*Id.*). Loop further pledged to Banco each operating subsidiary's respective "equipment, inventory, accounts, general intangibles, stock or partnership interests," include all proceeds from those assets.[5]

Finally, on September 24, 2002, Loop transferred its interests in Old Colony Partners, LP and 200 West Partners, LP to Loop Properties, Inc. (*See*, Affidavit of A. Jahelka, attached as <u>Exhibit O</u>, at ¶ 5). In addition to being an officer and director of Loop, Jahelka is also an officer and director of Loop Properties. (*Id.*). Once again, there is no indication that this "affiliate-to-affiliate" transfer was designed to accomplish anything other than hinder or delay Greenblatt's creditors.

Loop's bank records indicate that Greenblatt's efforts to loot the company and hide its assets have been successful. For example, Loop's May 2001 Marine Bank money market account statement reflects a balance of $254,090.77. Similarly, Loop's May 2001 Marine Bank checking account statement reflects deposits in the amount of $2,617,576.08, and an ending balance of $49,167.16. Eight weeks after Wachovia had filed its Statement of Claim against Loop in the NYSE Arbitration, Loop's money market and checking account balances had dropped to *$0.00* and *$0.21,* respectively. This is especially curious given the admissions by Banco and Chiplease in the *In re Resource Technology Corporation ("RTC")* bankruptcy, that RTC had paid $1,635,250 to Loop Corp. for "accounting and legal services" during the time period from February 29, 2000 through May 23, 2003.[6] (*See,* Exhibit P).

---

[5] It is unclear how (or if) Scattered reacted to the fact that Loop Corp's interests in EZLinks had already been pledged to Banco before they were transferred to Scattered.

[6] Resource Technology Corporation is yet another one of Greenblatt's entities. In that bankruptcy proceeding, Banco and Chiplease are creditors of RTC.

11

### I. GOULD & RATNER'S CONFLICTS

By the instant Motion, Gould & Ratner seeks to be employed as NOLA's counsel. However, Gould & Ratner is also seeking to be employed as Debtor's counsel in the *In re South Beach Securities, Inc.* litigation – even though South Beach is a creditor of NOLA. Gould & Ratner has also represented Scattered Corp. – a creditor of South Beach – as well as Loop Corp. and Loop Properties, Inc., two entities that were part of Greenblatt's scheme to defraud. Finally, NOLA's and South Beach's legal fees in this matter have been "guaranteed" by NOLA's manager, Teletech Systems, Inc. While this arrangement seemingly answers the question of how NOLA and South Beach could possibly afford to retain counsel – since neither entity is operating, and neither entity has any assets or employees – in truth the arrangement raises far more troubling concerns. It is simply inconceivable that one firm could in good faith represent all of these entities, where: (a) each are creditors of one another; (b) the entities are part of a global scheme to defraud; and (c) each entity will be facing a fraudulent transfer claim. The conflicts presented by Gould & Ratner's proposed employment as Debtors' counsel are real and insurmountable. Accordingly, this Court should deny their Motion.

### III. ARGUMENT

#### A. THERE ARE ACTUAL CONFLICTS OF INTEREST THAT PRECLUDE THE EMPLOYMENT OF GOULD & RATNER AS DEBTORS' COUNSEL

There is an actual conflict of interest that precludes Gould & Ratner from acting as counsel for NOLA on the one hand, and South Beach – *NOLA's creditor* – on the other hand. Rule 1.7 of the Illinois Rules of Professional Conduct provides in relevant part:

(a) A lawyer ***shall not*** represent a client if the representation of that client will be directly adverse to another client, unless:

    (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

    (2) each client consents after disclosure.

(b) A lawyer ***shall not*** represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client...unless:

12

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after disclosure. (Ill. R. Prof. Conduct, Rule 1.7) (emphasis added).

In this case, NOLA and South Beach are directly adverse to one another – South Beach is a creditor of NOLA. Moreover, one of Gould & Ratner's former clients, Scattered Corp., is a creditor of South Beach. Gould & Ratner could not "reasonably believe" that its representations of any of these entities would not be "adversely affected" given these facts.[7] The fact that South Beach has agreed to waive any and all claims that it has against NOLA does nothing to alleviate this conflict. To the contrary, it merely proves that NOLA and South Beach are not legitimate corporate entities, but rather are mere shell corporations that were used by Greenblatt in his fraudulent takeover scheme. Rule 1.7 of the Illinois Rules of Professional Conduct therefore mandates that this Court deny the instant Motion.

### B. ALLOWING GOULD & RATNER TO REPRESENT EITHER NOLA OR SOUTH BEACH WOULD "SANCTION A FRAUD"

For the same reasons that NOLA's creditors will be able to pierce the corporate veil and hold Greenblatt and his colleagues personally liable for the shell company's debt, this Court cannot allow Gould & Ratner to be employed as Debtors' counsel in this case – namely, to do so would sanction a fraud. The following entities – each of whom Gould & Ratner have previously represented, are currently representing or are seeking to represent by the instant Motion – are part of Greenblatt's fraudulent scheme:

| Client | Would Sanction a Fraud because… |
|---|---|
| NOLA | • Is part of Greenblatt's fraudulent scheme to acquire a controlling interest in HRMI;<br>• Purchased HRMI stock;<br>• Owes $3,290,000 to South Beach (another component of Greenblatt's fraudulent scheme); and<br>• Received fraudulent transfers from Loop Corp. (*See*, Ex. C). |

---

[7] Moreover, Gould & Ratner have not provided any signed consents by NOLA, South Beach or Scattered Corp. agreeing to the representation.

13

| Client | Would Sanction a Fraud because… |
|---|---|
| South Beach | • Is part of Greenblatt's fraudulent scheme to acquire a controlling interest in HRMI;<br>• Purchased HRMI stock;<br>• Is a creditor of NOLA; and<br>• Received fraudulent transfers from Loop Corp. (*See*, Ex. C). |
| Loop Corp. | • Is part of Greenblatt's fraudulent scheme to acquire a controlling interest in HRMI;<br>• Purchased HRMI stock;<br>• Provided fraudulent transfers to NOLA, South Beach, Repurchase Corp., Loop Properties (*See*, Ex. C); and<br>• Received fraudulent transfers from Chiplease, Inc. (*See*, Ex. C). |
| Scattered Corp. | • Is part of Greenblatt's fraudulent scheme to acquire a controlling interest in HRMI;<br>• Purchased HRMI stock;<br>• Is a creditor of South Beach; and<br>• Received fraudulent transfers from Loop Corp. (*See*, Ex. C). |
| Loop Properties, Inc. | • Received fraudulent transfers from Loop Corp. in an effort to defraud Greenblatt's creditors. (*See*, Ex. C). |

Moreover, Gould & Ratner's statement that Teletech Systems, Inc. has guaranteed payment of the Debtors' legal bills in this case provides cold comfort. Teletech Systems was yet another company that was part of Greenblatt's scheme to surreptitiously acquire a controlling interest in HRMI. (*See*, Ex. B). Teletech Systems – like the rest of these entities – will be the target of a fraudulent transfer claim. In this case, allowing one firm to represent all of these corporate shells would only allow Greenblatt to further hide his assets and transfers behind the veil of attorney-client privilege.

### C.  GOULD & RATNER WILL BE A WITNESS IN THIS CASE

Gould & Ratner must withdraw under Rule 3.7 of the Illinois Rules of Professional Conduct on the ground that attorneys from that firm will be called upon to testify against NOLA, South Beach, Greenblatt and his colleagues. As explained above, Gould & Ratner – an excellent estate planning and asset protection firm – has represented many of the corporate shells involved in Greenblatt's fraudulent scheme. As such, Gould & Ratner will be called upon to disclose whatever information and documents in its possession that pertain to the transactional aspects of Greenblatt's shell companies. Although Wachovia has no evidence at this point that Gould & Ratner has knowingly facilitated Greenblatt's

scheme to defraud his creditors, should such evidence come to light during discovery Gould & Ratner will also become a defendant in this case.

## IV. CONCLUSION

WHEREFORE, for all of the reasons set forth above, Wachovia Securities, LLC, respectfully requests that this Court enter an Order denying the *Amended Application of the Debtor for an Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a), Authorizing the Employment and Retention of Attorneys*, and granting any such other and further relief as it deems just.

Respectfully submitted,

**WACHOVIA SECURITIES, LLC**


By:    /s/ Christopher S. Griesmeyer
       One of Its Attorneys

BRYAN I. SCHWARTZ (ARDC 6192739)
GARY I. BLACKMAN (ARDC 6187914)
CHRISTOPHER S. GRIESMEYER (ARDC 6269851)
LEVENFELD PEARLSTEIN, LLC
2 North LaSalle Street
Suite 1300
Chicago, Illinois 60602
(312) 346-8380
(312) 346-8434 (Fax)

15